THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SHARLETTE WRIGHT, Defendant-Appellant.

First District (1st Division) No. 1—87—0506

Opinion filed August 31, 1992.

Randolph N. Stone, Public Defender, of Chicago (Edwin A. Burnette, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Jane E. Loeb, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

On July 31, 1985, defendant Sharlette Wright allegedly beat E.R., 23 months old at the time, resulting in E.R. sustaining multiple skull fractures, herniation of the brain and paralyzation of a portion of her body's left side. Defendant was hired to care for E.R. while E.R.'s parents were at work. After a jury trial, defendant was found guilty of aggravated battery of a child and cruelty to children. The circuit court sentenced defendant to seven years' imprisonment for the aggravated battery of a child and three years for cruelty to children to run concurrently.

Defendant appeals her sentence and conviction arguing that the circuit court (1) erred in admitting the statements of E.R. and testimony of B.W.'s conduct; (2) erred in admitting Sharmin Powell's testimony regarding other abusive acts by defendant; (3) abused its discretion by finding K.W. incompetent to testify; (4) violated her sixth amendment rights by precluding the cross-examination and impeachment of the State's witnesses; (5) erred in excluding character evidence that defendant was a loving and caring child-care worker; (6) violated defendant's sixth amendment right to present a defense by denying the admission of evidence relating to the child abuse syndrome; (7) erred in failing to find that she demonstrated a *prima facie* case of purposeful discrimination by the State in its use of peremptory challenges; (8) placed her in double jeopardy; (9) erred in denying her motion for substitution of judge for cause; (10) violated her fifth and fourteenth amendment rights to due process by denying discovery of the records of the child protection committee of Evanston Hospital; (11) deprived her of a fair trial by its rulings and bias; and (12) denied her the eighth amendment right to a fair and impartial sentence.

Prior to trial, defendant filed a motion for change of venue, arguing that the change would provide a venue with a better racial mix and a jury which was not exposed to media coverage of the allegations. The circuit court denied the motion. Later, defendant, again, moved for a change of venue, specifically to 26th Street and California Street in Chicago. This motion was also denied.

Then, the State moved to quash a subpoena served on Evanston Hospital to obtain the child protection agency's files and reports on E.R. Defendant opposed the motion. After hearing argument, the circuit court granted the State's motion.

Next, defendant filed motions *in limine* to preclude any testimony regarding "excited utterances" of B.W., a friend of E.R.'s, who was present the day of the alleged beating, and S.R., E.R.'s mother, from testifying to any of E.R.'s "excited utterances." The circuit court granted defendant's motion as to E.R. and as to B.W.'s statements, but denied defendant's motion as to B.W.'s conduct.

The circuit court held a hearing to determine the competency of K.W., E.R.'s seven-year-old sister. The circuit court initially found K.W. competent. However, after considering S.R.'s statements, along with K.W.'s psychiatrist Dr. Bernard Lifson's testimony, the circuit court reversed its ruling. Reconsideration was requested and denied.

Next, the State filed a motion *in limine* to limit character evidence of the defendant. The court ruled that the character traits of a skilled, loving and caring child-care provider and traits consistent with the child abuse syndrome were irrelevant. The court ruled it would allow evidence that defendant was a peaceable and law-abiding citizen. The State also moved to preclude evidence of its key witness, Sharmin Powell, dealing or using drugs. This motion was granted. Further, the circuit court granted the State's motion to preclude any reference to the Department of Children and Family Services' (DCFS's) investigation which indicated that Powell was abused as a child.

Before jury selection, defense counsel moved that counsel be able to participate in *voir dire* and sequestering of the jury. The motion was denied, but the court invited counsel to suggest questions and *voir dire* was done *in camera*. Defense counsel tendered proposed *voir dire* questions to the court, including questions pertaining to possible racial prejudices and "bad race" experiences. The court refused to use the race-based questions. After jury selection began, defendant moved for mistrial pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, based on the limited representation of blacks in the venire. The motion was denied. Defendant renewed the motion after jury selection was completed. Again, the motion was denied.

Defense counsel was given a file on Powell from the juvenile court and the DCFS after the jury had been sworn. Defense counsel responded by moving for a mistrial. The motion was initially denied, but after hearing argument and talking with counsel, the court declared a mistrial. Defense counsel acknowledged that the mistrial was granted at his request. Disregarding this admission, defendant moved to dismiss the indictment on the basis of double jeopardy. The court denied the motion.

Prior to the second trial, both the State and defendant renewed all of their previous motions. The circuit court made the same rulings on the renewed motions as it had on the original motions. The court did, however, agree to question the venire on whether defendant's race would enter into their judgment. Then, defendant moved to dismiss the venire as only 1 of 65 was black. The motion was granted. A new venire was used for jury selection. After the first panel, two of four of whom were black, was accepted, defendant moved to require the State give race-neutral reasons for using its peremptory challenges on four of six blacks and five of six women. The motion was denied.

At trial, Powell testified that she and defendant knew each other from high school. Powell was employed to take care of two-year-old B.W. Powell and defendant, who took care of 23-month-old E.R. and E.R.'s sibling K.W., who was five years old at the time of the alleged offenses, would get together while they took care of the children.

Powell testified that on July 31, 1985, she and B.W. went with defendant and E.R. to the library. After being at the library, they stopped off for doughnuts and pizza. E.R. did not want a doughnut, but defendant "stuffed it in her mouth and told her she was going to eat it because she paid for it." When the four arrived at E.R.'s home, defendant changed into black wool pants and went into the kitchen to prepare lunch. E.R. did not want all of her pizza, so defendant, again, "stuffed it in her mouth." Powell testified that after lunch, the four went into the family room. E.R. was playing in the toy area. Defendant told E.R. to come to her. According to Powell, E.R. "took her time coming." In response to E.R.'s actions, defendant grabbed her by the shirt and "knocked her back." Then, defendant "started hitting [E.R.'s] head on the floor." After this, defendant "grabbed [E.R.] around her ankles" and "threw [E.R.] over the sofa." Powell testified that E.R. "laid [sic] on the sofa in the same position she landed." Powell stated that E.R. looked scared and her eyes were watery. Powell told E.R. to come to her, but defendant threatened E.R. by saying that E.R. had "better not go to [Powell]."

Next, Powell testified that defendant put E.R. on her lap and started brushing her hair. Defendant gave E.R. a book and instructed her to begin reading. E.R. said the word "bugle." Defendant began slapping E.R. with her open hand, saying, " 'horn, horn, horn.' " Defendant tore up the book and threw it on the floor. Powell testified that then, defendant turned E.R. around on her lap and started shaking her and calling her "stupid." Powell yelled at defendant, and she stopped. At this point, E.R.'s "head went back and her arms just

hung to the side." E.R.'s eyes "were rolling in her head." Powell testified that defendant said, "Oh, no, Sharmin. This is what happened Monday." Powell took E.R. from defendant, and E.R.'s head "was laying [sic] back where she didn't have any support on her head." Defendant threw cold water on E.R.'s face. Powell further testified that "[a] gurgling sound came out of [E.R.'s] mouth and [defendant] grabbed her and said she was taking her next door, he's a doctor. And she ran out of the house."

Defendant returned from neighbor Dr. John Caliendo's house and told Powell that E.R. was being taken to the hospital. Defendant informed Powell that she told the Caliendos that E.R. had fallen out of a "high chair," and that if anyone asked Powell about the incident, Powell should "tell them the baby fell out of the high chair."

Powell testified that she went to Evanston Hospital. Powell told a woman from the hospital's crisis intervention that she did not see E.R. fall, but saw where she hit the floor. Powell explained that she did not tell the truth because she was scared.

Powell further testified that later that evening, defendant telephoned her. Defendant told Powell that a social worker had accused her of beating E.R., but that S.R. was "behind her 100 percent." After this conversation, Powell called her father and admitted that defendant was not telling the truth. Powell's father told her to get some rest and he would see her the next day.

The next day, Powell went to work, but could not control her feelings. After speaking with Powell, B.W.'s mother called Powell's father. Powell's father took her to Evanston Hospital, where she related the above testimony to a woman from crisis intervention.

Also, Powell testified that in May 1985, she witnessed defendant grab E.R. and jerk her. In June 1985, defendant hit E.R. in the head with her hand, knocking E.R. backwards. Additionally, Powell testified that on another occasion defendant took Powell's sandal and hit E.R.'s head with it. In July 1985, defendant forced E.R. to squat and hold her hands on top of her head. That same day defendant ordered E.R. to lie on her back with her legs in the air. Another incident occurred while defendant was attempting to toilet train E.R. and E.R. wet her diaper. Defendant became angry, removed E.R.'s clothing and for 10 minutes locked her in the bathroom with the lights off and demanded E.R. use the toilet. After observing the above incidents, Powell asked defendant why she was mistreating E.R. Defendant responded that Powell should mind her own business. Defendant also commented that if she "had [B.W.] for a week, he would not be the way he was, he would be a different child."

Powell also identified photographs of various rooms of E.R.'s home, defendant's black wool pants on a chair in the family room, and E.R.'s book which defendant tore. These photographs were admitted as evidence.

Then, Powell testified that on February 4, 1986, defendant telephoned her at work and told Powell her "ass was out." In April 1986, defendant called and threatened that Powell could move her residence, but that she could not hide from defendant. Defendant also stated that she wanted to "see [Powell] dead." Powell informed the police of these phone calls. On May 8, 1986, defendant again telephoned Powell. Powell testified that defendant said, "[i]f you testify, you're dead" and that Powell had "better lock the back door and that [defendant] was going to kick my mother-fucker ass and I was a dead bitch." Powell kept a log of the date and substance of defendant's telephone calls.

Next, Dr. Caliendo testified that on July 31, 1985, at approximately 12:30 p.m., defendant came to his home carrying E.R., who was unconscious and flacid. After examining E.R., Caliendo stabilized her and waited for the paramedics to arrive. Caliendo accompanied E.R. in the ambulance to the hospital. When E.R.'s parents arrived and were informed of the circumstances, they asked Caliendo to go into their home and remove the high chair. Upon entering E.R.'s home, Caliendo observed the high chair upright, with the clean tray in the proper position and a bib folded neatly over the back of the seat. Caliendo further testified that he noticed a step stool in the kitchen.

Dr. Joseph Hageman, director of Evanston Hospital's pediatric intensive care unit, testified that he was called to the emergency room on July 31, 1985, at about 1 p.m. Hageman explained that E.R. was unconscious, basically unresponsive to human stimuli, had abnormal "posturing" movements to stimulation, indicating an abnormal condition of the brain, and her pupils were enlarged and unresponsive to light. Hageman also observed herniation of E.R.'s brain (the brain coming through the skull from massive swelling, which usually causes death). A CAT scan of E.R.'s head indicated multiple skull fractures.

Hageman testified that he performed surgery to open up E.R.'s skull and remove portions of the brain, in order to prevent her massively swollen brain from bursting through the skull. The surgery was a lifesaving measure. E.R. remained comatose and unresponsive in a life-or-death situation in the intensive care unit for three weeks.

Hageman testified that E.R.'s injuries were consistent with having someone hit her head against the floor, being flung onto a sofa, slapped on either side of her head and shaken violently. Hageman

stated that the defendant told him that E.R. had fallen from a step stool, which was 2½ feet high. Hageman testified that E.R.'s injuries were inconsistent with a fall from such height. In fact, Hageman pointed out that a child fell 30 feet over a balcony and did not sustain as severe injuries as E.R.

Next, S.R. testified that she returned to work two months after giving birth to E.R. and hired defendant as a care giver. S.R. testified that in late 1985, when defendant was experiencing difficulties with her boy friend, S.R. noticed changes in defendant's behavior. S.R. gave defendant advances on her pay and loaned her $1,000 to purchase a car. In July 1985, S.R. observed behavioral changes in E.R. E.R. took longer naps, became afraid of the dark, and had diarrhea. S.R. instructed defendant that E.R. was on a bland diet and should eat foods such as saltine crackers, dry Cheerios and chicken noodle soup.

S.R. testified that on July 28-29, 1985, E.R. had diarrhea and a low grade temperature. On Monday, July 29, S.R. telephoned home at about 2 p.m., and defendant did not divulge anything unusual. When S.R. returned home that evening at 5:45, defendant reported that E.R. had fallen out of her plastic car onto the patio, hitting her head. S.R. testified that defendant informed her that E.R.'s "eyes rolled back, and that [defendant] had gotten water *** and put it on [E.R.'s] face to revive her and shaken her a little bit and [E.R.] came to, so that she was only out for a moment." There was a bump on E.R.'s head.

S.R. testified that she spent the early morning hours of July 31 holding E.R., which was unusual. E.R. seemed to still be sick and did not want to eat. When defendant arrived, S.R. reminded her that E.R. was to eat bland food, but that defendant should not force E.R. to eat. At approximately 1 p.m., S.R. received a telephone call informing her to go to Evanston Hospital. When S.R. arrived, defendant specifically told her that E.R. had fallen out of her high chair while defendant was using the upstairs bathroom.

At the time of trial, S.R. testified that E.R. was engaged in physical, occupational and speech therapy every day. Mentally, E.R. has still not obtained the development she had before she was injured.

Officer Bennett testified to the conduct of B.W. while being interviewed by social worker Gail Overgaard. Bennett testified that he and Overgaard arrived at B.W.'s home on August 3, 1985. Overgaard played with B.W. and gave him a white doll which he played with happily. Then, Overgaard gave B.W. a black doll. B.W. scowled at the black doll as if afraid or shocked. B.W. put down the white doll and

ran away from the play area to a corner of the room. Overgaard put the dolls away for a while; then, she brought them out again. Bennett testified that Overgaard and B.W. appeared to have a conversation, after which Overgaard handed the two dolls to B.W. B.W. took the black doll and placed it on top of the white doll and hit them on the floor. After doing this, B.W. threw the white doll off to the side and set the black doll down.

Merny Miller, an Illinois Bell employee responsible for "traps and traces," testified that on May 8, 1986, the number where Powell works had a "connect" from 328-7146. The calling number was billed to Sharlette Robinson, a name defendant sometimes used.

Defendant took the witness stand on her own behalf. Defendant testified that on July 31, 1985, she prepared lunch for E.R., who was sitting in her high chair, but was not feeling well. Defendant stated that when E.R. was done eating she took E.R. out of the chair and E.R. went into the family room. Defendant testified that Powell was in the family room with E.R., and B.W. was still eating in the kitchen when she went to use the *downstairs* bathroom. Then, however, defendant changed her testimony and stated that E.R. was still in the kitchen when she went to the bathroom. Next, defendant responded to a question regarding E.R.'s whereabouts in the kitchen by stating, "She was sitting on a stool, it's a—I say a high chair, but I think it's more of a stepladder." According to defendant, Powell called her while she was in the bathroom and said that E.R. had fallen. When defendant came back into the kitchen, E.R. was on the floor next to the stool. Defendant testified that she picked up E.R., shook her and poured water over her face. Defendant denied ordering Powell to tell the "story" that E.R. had fallen.

Defendant also testified to the events of July 29, 1985. Defendant stated that she was pushing E.R. on her toy car, when it ran over another toy and E.R. fell off the car. Further, defendant denied all allegations concerning abuse and threats. Moreover, defendant denied yelling at E.R. to say "horn" instead of "bugle." Defendant did not know how E.R.'s book got torn. After defendant testified, 12 witnesses testified to her reputation for truth and that she was a peaceful and law-abiding citizen.

Dr. Stott testified on behalf of defendant that, based on her review of Overgaard's interview with B.W., she was unable to discern who B.W. felt the perpetrator was. Stott concluded that Overgaard's report was inaccurate because there was no narrative and Overgaard put ideas into B.W.'s head by using two dolls instead of four, when there were four people present when E.R. sustained her injuries.

Stott further opined that the interview illustrated Overgaard's preconceived notion that there was only one perpetrator. During cross-examination, however, Stott admitted she had never spoken with Overgaard to ascertain whether she had a preconceived notion and was not aware that B.W. actually gave a narrative.

The jury returned guilty verdicts on the aggravated battery to a child and cruelty to children counts. The court sentenced defendant to concurrent seven and three years on the above convictions, respectively. Defendant appeals those convictions and sentences.

First, defendant argues that the statements of E.R. and testimony of B.W.'s conduct were improperly admitted because the above were unreliable and had no evidentiary value. Prior to trial, the court ruled that E.R.'s statement that defendant "hurt my head" regarding abuse previous to that in the present case did not meet the excited utterance exception to the hearsay rule, and therefore, would not be admissible. Nonetheless, because of defense counsel's cross-examination of S.R., E.R.'s statement was admitted into evidence.

During cross-examination of S.R. defense counsel asked:

"Q. Well, at no time did *** [E.R.] indicate she was frightened of [defendant], did she?

A. There were a number of instances in which [E.R.] expressed—oh, I don't know whether it was being frightened or upset when [defendant] appeared.

* * *

Q. [A]t no time did [E.R.] ever appear not to want to stay with [defendant], didn't you tell the doctors that?

* * *

A. I believe that I told the doctors that I—that I didn't find anything in [E.R.'s] behavior that indicated that she didn't want to stay with [defendant], but looking back now I see that my interpretation of the events were [sic] wrong."

After cross-examination, the State requested a sidebar. The State argued, and the court agreed, that defense counsel "opened the door" to an inquiry by the State as to statements made by E.R. to S.R., specifically, that E.R. told S.R. that defendant had hurt her head. Further, the State argued that defense counsel was attempting to give the jury the impression that E.R. never complained about defendant.

■ Where evidence is needed to correct an impression brought out by defendant's misleading cross-examination, it is proper for the trial court to allow the State to introduce contradictory or explanatory evidence even though it would not have initially been admissible.

(*People v. James* (1988), 123 Ill. 2d 523, 534-35, 528 N.E.2d 723, 728, citing *People v. Payne* (1983), 98 Ill. 2d 45, 456 N.E.2d 44.) On appeal, defendant cannot complain about the admissibility of evidence she invited through the unfavorable inference arising from testimony elicited by her own counsel. (*People v. Marino* (1980), 80 Ill. App. 3d 657, 666, 400 N.E.2d 491, 498.) In the present case, defense counsel, through S.R.'s cross-examination, opened up the issue of whether E.R. had ever complained about defendant. The circuit court, therefore, properly allowed the State to introduce the complained-of testimony to eradicate an unfair impression which defense counsel left with the jury through his cross-examination of S.R.

Additionally, defendant argues that the testimony relating the conduct of B.W., who was two years old at the time, while being interviewed by Overgaard was improperly admitted. In response to a motion *in limine,* the court ruled that B.W.'s conduct would be admissible, but not any of his statements. In order for evidence to come within the spontaneous declaration exception, there must be (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) an absence of time to fabricate, and (3) the statement must relate to the circumstances of the occurrence. (*In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, 460 N.E.2d 912.) Further, even though a statement is timely removed from the event, it may still be "spontaneous" if the stress or emotional upset created by the event is still present at the time the statement is made. (*Theis,* 121 Ill. App. 3d at 1097, 460 N.E.2d at 916.) Furthermore, the fact that a statement is made in response to detailed inquiries does not destroy the unreflectiveness or spontaneity of the statement. (*Theis,* 121 Ill. App. 3d at 1097, 460 N.E.2d at 916.) Moreover, the form of the inquiry should only go to the weight, not the admissibility, of the evidence. *Theis,* 121 Ill. App. 3d at 1098, 460 N.E.2d at 918.

■ B.W.'s conduct met the above criteria. Defendant's abusive actions were sufficiently startling to produce a spontaneous and unreflecting statement. After witnessing defendant's abusiveness, B.W. became withdrawn and agitated. The first time defendant's name was mentioned after that abuse, B.W. became upset. B.W. "evidenced the type of emotions which would be produced by the activation of the stress which developed from the event, and the activation of [his] memories of the event." (*Theis,* 121 Ill. App. 3d at 1097, 460 N.E.2d at 917.) It is unlikely that B.W. would have been able to fabricate his conduct with the dolls to exactly match the testimony at trial. Further, the dolls were given the defendant's name and E.R.'s name; thus, B.W.'s conduct clearly related to the abuse incident.

Defendant also argues that B.W.'s conduct was inadmissible because he is incompetent to testify as a matter of law. The reliability and, therefore, admissibility of a spontaneous declaration comes not from the reliability of the declarant, but from the circumstances under which the statement is made. (*People v. Cherry* (1980), 88 Ill. App. 3d 1048, 1052, 411 N.E.2d 61, 65.) Consequently, this argument is meritless.

Defendant contends that testimony regarding her prior abusiveness toward E.R. was improperly admitted because it served only to show her propensity or disposition to commit the crimes involved in the instant case. Defendant failed to include this issue in her motion for a new trial.

■ According to *People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 453, 472-73, this alleged error involves an evidentiary ruling. The alleged error is not a constitutional issue which could later be raised in a post-conviction hearing petition. (*Young*, 128 Ill. 2d at 46, 538 N.E.2d at 472-73.) Further, this alleged error does not involve the question of the sufficiency of the evidence. Under *Young*, which applies the guidelines of *People v. Enoch* (1988), 122 Ill. 2d 176, 190, 522 N.E.2d 1124, 1129-31, defendant has waived any error regarding testimony of her prior abusiveness by failing to include the issue in her post-trial motion. *Young*, 128 Ill. 2d at 46, 538 N.E.2d at 472-73.

Defendant further argues that the circuit court abused its discretion by reversing its initial finding of K.W.'s competency. After listening to some argument, the circuit court originally ruled:

"[K.W.] is at the bottom of the scales as far as age for competency. She appears to be very bright, responsive, aware young lady. I think she would be competent to testify in this matter, if [defense counsel] wishes to have her testify."

Thereafter, S.R. indicated in open court that K.W.'s testimony was not the whole truth because of the trauma K.W. experienced due to the events of this case. In response to this revelation, the circuit court said:

"I have to say that I'm sorry that I was so quick in my ruling, because I now realize that there may be many other issues.

\* \* \*

I think I was premature. I'm not saying that I'm going to change it or say that [K.W.] isn't [competent]. But I think that I was premature so that my finding of competency is withdrawn, and that I'm going to reserve ruling on it. I want to think it out some more."

■ At another competency hearing on K.W., Lifson testified that he concluded that K.W. would try to answer questions honestly, but has a tendency to answer what she believes people want to hear from her. Lifson further stated that K.W. could answer questions which were not connected with "charged" feelings. S.R. told the court that although defense counsel indicated he would only inquire about matters prior to E.R.'s injuries, in K.W.'s mind those matters are related to the incidents charged in the case at bar. Based on Lifson's testimony, conducting an examination of K.W. for an hour and one-half, and S.R.'s statements, the circuit court found K.W. incompetent to testify.

The trial judge has the discretion to determine the competency of a child witness, and that ruling will be reversed only in the event of a manifest abuse of discretion or misapprehension of some legal principle. (*People v. Salazar* (1976), 37 Ill. App. 3d 800, 347 N.E.2d 86.) Defendant cites nothing that evidences the circuit court abused its discretion. It is apparent from the record that the circuit court made a thoughtful and informed ruling. We uphold the circuit court's finding that K.W. was incompetent to testify.

■ Next, defendant argues that the circuit court's restriction of defense counsel's cross-examination of Powell regarding her juvenile record, alleged drug use and dealing and reputation for truth denied defendant her sixth amendment right of confrontation. Evidence of a juvenile adjudication of a witness, other than a defendant, may be used for the purposes of attacking the credibility of a witness on the basis of interest, bias or willingness to disobey the law if (1) the conviction would be admissible if an adult, and (2) its admission in evidence is necessary to a fair determination of guilt or innocence. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 517, 268 N.E.2d 695, 699.) The only juvenile adjudication of Powell was for retail theft for which Powell received supervision. "An order of supervision is not a conviction, but 'more in keeping with a continuance, pending the defendant's good conduct, with potential dismissal of the charges [citation] upon acceptable compliance.' " (*People v. Tyson* (1985), 137 Ill. App. 3d 912, 919, 485 N.E.2d 523, 529, quoting *People v. Roper* (1983), 116 Ill. App. 3d 821, 824, 452 N.E.2d 748, 750; *People v. Tarkowski* (1981), 100 Ill. App. 3d 153, 426 N.E.2d 631.) Powell, thus, could not have been impeached by the prior juvenile adjudication because an adult's supervision is not admissible evidence for impeachment purposes, and according to case law, if a "conviction" is not admissible for an adult, it is not admissible for a juvenile. (See *Montgomery*, 47 Ill. 2d at 517, 268 N.E.2d at 699.) Accordingly, the circuit court did

not abuse its discretion when it determined that Powell's juvenile records were inadmissible.

Additionally, defendant contends that she should have been able to offer proof of Powell's alleged drug dealing and use. Defense counsel initially alluded that evidence of Powell's drug use was contained in her juvenile records. Defense counsel, however, failed to show that Powell's juvenile records contained any drug adjudication. Then, defense counsel argued that he should be allowed to present evidence of Powell's alleged current drug dealing and use.

In order to preserve an issue concerning the circuit court's preclusion of impeaching evidence at trial, defendant must set forth an offer of proof at trial to establish on the record, for the purpose of review, that the evidence she sought to admit was positive and direct on the issue of bias or motive to testify falsely. (*People v. Sanders* (1986), 143 Ill. App. 3d 402, 407, 493 N.E.2d 1, 4-5.) Formal offers of proof, where the proposed evidence is offered in a question-and-answer format outside the presence of the jury, are usually required to preserve the preclusion issue. An informal offer of proof may, however, be sufficient to preserve review if it is specific enough and not based on mere speculation and conjecture. *Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 722, 504 N.E.2d 781, 785; *People v. Brown* (1982), 104 Ill. App. 3d 1110, 1119, 433 N.E.2d 1081, 1088-89.

■ The case at bar is analogous to *People v. Phillips* (1989), 186 Ill. App. 3d 668, 542 N.E.2d 814. In *Phillips*, which involved the admission of drug evidence, the appellate court held that the offers of proof were insufficient to preserve the alleged errors for review because the offer consisted only of a brief description of what counsel's proposed evidence would show. (*Phillips*, 186 Ill. App. 3d at 679, 542 N.E.2d at 821.) In finding that the circuit court did not abuse its discretion, the appellate court also noted that the circuit court suggested to defense counsel that he make a formal offer of proof, yet counsel failed to do so. (*Phillips*, 186 Ill. App. 3d at 679, 542 N.E.2d at 821.) In the present case, defense counsel never stated who these witnesses would be, or where they allegedly saw Powell using or dealing drugs, other than the vague explanation, "in the streets." This kind of offer of proof clearly is not specific enough to preserve this issue for review. Defendant, thus, waived it.

Defendant also argues that the circuit court improperly barred testimony regarding Powell's reputation in the community for truth and veracity. The State argues that defense counsel failed to lay a proper foundation for this testimony. We agree.

■ Character evidence should be confined to proof of general reputation in the community at or prior to the commission of the offense. (*People v. Willy* (1921), 301 Ill. 307, 133 N.E. 859.) Character evidence must not be allowed to cover reputation after the commission of the offense or what was said after the offense with reference to the character, regardless of whether the reference was to the witness' character before or after the offense. (See *People v. Bascomb* (1979), 74 Ill. App. 3d 392, 394, 392 N.E.2d 1130, 1132.) Defense counsel proffered character witnesses whose conversations regarding Powell's character took place with people after the commission of the offenses in the instant case. Accordingly, those witnesses' testimony is inadmissible. The circuit court, therefore, did not abuse its discretion by barring that character testimony.

Defendant's next argument is that the circuit court erred in excluding evidence that defendant was a loving child-care provider. Defense counsel argued that the issue as to defendant's character was whether she "had a reputation for being a skilled, caring and loving care worker." Defense counsel compared such evidence to evidence in a medical malpractice case in which a doctor is permitted to show his reputation for being skilled, when charged with below-standard care treatment. The circuit court responded that in the instant case the issue does not involve a standard of care. The court stated that admissible character evidence in the case at bar is the defendant's reputation in the community for violence or peacefulness. The circuit court ruled that defendant's character witnesses could testify to defendant's reputation for violence or peacefulness, but not regarding defendant's child-caring skills.

■ Defendant was charged with aggravated battery to a child. A defendant can offer proof of previous good character as is inconsistent with the commission of the crime charged. This proof is made by showing a general reputation for the specific trait of character involved to suggest the inference that the defendant acted consistent with his character. (*People v. Thornton* (1978), 61 Ill. App. 3d 530, 378 N.E.2d 198.) On this issue, the present case is similar to *People v. Hoffman* (1986), 146 Ill. App. 3d 823, 827-28, 497 N.E.2d 366, in which defendant was charged with knowingly entering false information on a tax return. The defendant attempted to admit evidence that he had properly prepared other tax returns. The appellate court held that the proper preparation of other tax returns would "not tend to prove or disprove the contested issue." (*Hoffman*, 146 Ill. App. 3d at 832, 497 N.E.2d at 372.) Similarly, the evidence that defendant was loving and caring toward another child is irrelevant to whether she

abused E.R. (See *In re R.M.* (1991), 219 Ill. App. 3d 747, 752, 579 N.E.2d 1070, 1072.) The circuit court did not err in excluding defendant's character witnesses' testimony regarding her reputation as a child-care provider.

In an attempt to show that Powell, not defendant, committed the offense charged in the instant case, defense counsel tried to present evidence that Powell had been an abused child, and that, according to the child abuse syndrome, Powell was the person who beat E.R. The circuit court properly denied admission of this evidence.

A defendant may attempt to prove that another party committed the offenses for which he is charged. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696, 701-02.) Evidence, however, is only admissible if it tends to make the question of guilt more or less probable. (*Ward*, 101 Ill. 2d at 455, 463 N.E.2d at 702.) If the evidence is remote, uncertain or could possibly cause unfair prejudice, the evidence may be excluded. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 971, 455 N.E.2d 733, 797.) Furthermore, the circuit court has broad discretion in ruling on materiality and relevancy. These rulings should not be reversed unless there has been an abuse of discretion. *Ward*, 101 Ill. 2d at 455-56, 463 N.E.2d at 702.

In *People v. Castro* (1989), 190 Ill. App. 3d 227, 546 N.E.2d 662, the appellate court held that the trial court properly denied the admission of evidence that defendant's stepson had committed a drug offense and was on probation for possession of cocaine at the time of the defendant's arrest. Evidence of someone else having a prior conviction similar to the offense with which defendant is charged is of little probative evidence. (*Castro*, 190 Ill. App. 3d at 239, 546 N.E.2d at 669.) The evidence which defendant proffered pertaining to Powell is even more remote and tenuous and less probative than the evidence in *Castro*. We find no abuse of discretion.

Defendant argues that she made a *prima facie* case of purposeful discrimination by the State pursuant to *Kentucky v. Batson* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Defendant has waived review of this issue by failing to preserve an adequate record. (*People v. Johnson* (1986), 150 Ill. App. 3d 1075, 502 N.E.2d 304.) Although defense counsel preserves in the record the racial makeup of the first panel, two of the four in that panel were black, he fails to preserve the racial makeup of the sitting jury, the venire and the State's peremptory challenges. The record is so incomplete that it is impossible for this court to determine whether or not a *prima facie* case of purposeful discrimination was made by defendant. The issue is waived. See *Johnson*, 150 Ill. App. 3d at 1075, 502 N.E.2d at 304.

■■■ After the court informed the State and defendant that a DCFS file on Powell had been discovered, defense counsel moved for a mistrial on the basis that he needed time to review the file. The jury had already been sworn; therefore, jeopardy had attached. (*Crist v. Bretz* (1978), 437 U.S. 28, 57 L. Ed. 2d 24, 98 S. Ct. 2156.) Despite defense counsel's admission that the mistrial was granted at his request, defendant contends that the circuit court declared a mistrial *sua sponte* and without her consent, thus requiring the court to grant her motion to dismiss the indictment against her because another trial would put her in jeopardy twice. Retrial would be barred if the mistrial was based on defendant's motion, but essentially goaded or caused by the State's overreaching, or if based on the circuit court's *sua sponte* motion where a manifest necessity was lacking. (*People ex rel. Mosley v. Carey* (1979), 74 Ill. 2d 527, 535, 387 N.E.2d 325, 328.) Neither of those scenarios is present in the instant case. Defense counsel acknowledged that he was "the one who requested the mistrial." The record is devoid of any evidence of goading or overreaching by the State. The retrial of defendant did not put her in double jeopardy.

After Powell's testimony and denial of defendant's renewed motion regarding discovery of hospital records, defendant filed a verified motion for the substitution of the trial judge for cause. Prior to this motion, the trial judge had ruled against defendant on several substantive motions. Defendant correctly states that pursuant to section 114—5(c) of the Code of Criminal Procedure of 1963 (currently section 114—5(d)), she may move at any time for substitution of judge for cause. (Ill. Rev. Stat. 1985, ch. 38, par. 114—5(c).) In defense counsel's verified motion he alleges the trial judge demonstrated his prejudice by precluding defendant from (1) putting on any defense; (2) calling the seven-year-old sister of the victim, who was ruled incompetent to testify, as a witness; (3) calling a character witness to testify to the reputation of the State's "star" witness; (4) cross-examining the State's "star" witness about her alleged drug use, her being a victim of child abuse and her relocation based on fear; (5) putting on expert testimony; (6) viewing "vital" hospital records; and (7) other factors which would develop at an evidentiary hearing.

A defendant's right to substitution of judge for cause is not absolute. (*People v. Andricopulos* (1987), 162 Ill. App. 3d 899, 909, 516 N.E.2d 302, 308.) A defendant has the burden of substantiating such prejudice on the part of the judge which disqualifies him from sitting as the judge in the case. (*Andricopulos*, 162 Ill. App. 3d at 909, 516 N.E.2d at 308, citing *People v. Dunigan* (1981), 96 Ill. App. 3d 799,

421 N.E.2d 1319.) "The alleged bias or prejudice *** must be shown to have stemmed from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case." *(People v. Massarella* (1979), 80 Ill. App. 3d 552, 565, 400 N.E.2d 436, 447.) "Prejudice is a condition of the mind that imports the formation of a fixed anticipatory judgment as distinguished from opinions which yield to evidence." *(People v. Robinson* (1974), 18 Ill. App. 3d 804, 807, 310 N.E.2d 652, 655.) The trial court is in the best position to determine whether it has become prejudiced. *People v. Hall* (1986), 114 Ill. 2d 376, 499 N.E.2d 1335.

■■ In *In re C.S.* (1991), 215 Ill. App. 3d 600, 575 N.E.2d 1, the allegation was that the trial court erred in failing to assign the case to a neutral judge for a hearing on the motion for substitution of judge for cause. The appellate court found that the trial court had not formed an opinion of the merits of the case and, therefore, was not prejudiced against the complaining party. Moreover, the record clearly failed to show any unfairness to the complaining party. Ultimately, the appellate court held that the complaining party failed to meet its burden of showing the court was prejudiced against it. (*In re C.S.*, 215 Ill. App. 3d at 602, 575 N.E.2d at 2.) Similarly, in the case at bar, defendant failed to show that the trial court was prejudiced. We have found that all the allegations contained in defendant's motion for substitution were properly decided by the trial court. Defendant has failed to meet her burden of showing the trial court's prejudice. Accordingly, the trial court properly denied defendant's motion for substitution.

Defense counsel subpoenaed the records from the Child Protection Committee at Evanston Hospital, claiming he was interested in obtaining the findings of the Committee and why it suspected child abuse caused E.R.'s injuries. An attorney for the hospital appeared in court to quash the subpoena. The hospital's attorney argued that the records were privileged under section 11.1 of the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1985, ch. 23, par. 2061). The court conducted an *in camera* inspection of the records and granted the hospital's motion to quash the subpoena.

■■ Now, defendant contends that the records "might" have aided in assessing the credibility of Powell, because Powell "might" have spoken to one or more of the hospital committee members and "might" have said something inconsistent with her trial testimony. The confrontation clause does not compel the pretrial production of information that *might* be useful in preparing for trial. (*Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 94 L. Ed. 2d 40, 107 S. Ct. 989.)

Therefore, the circuit court did not err in quashing defendant's subpoena.

 Defendant's next contention is that the circuit court judge's rulings, as well as the tenor of communication, indicate that he abdicated his role as a neutral judge resulting in prejudice to defendant. We have found that the circuit court's rulings which defendant questioned were proper. Defendant cites no instances in which the trial judge was biased or even rude to defense counsel. Defendant's argument regarding the trial judge's alleged prejudice is meritless.

 Lastly, defendant argues that the circuit court erred in allowing S.R. to read a victim-impact statement at the sentencing hearing because it resulted in an unfair sentence. Defense counsel initially objected to the reading of the victim-impact statement, but later acquiesced. Since defendant acquiesced, she waived this issue. See *Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.

For the foregoing reasons, the conviction and sentence of the circuit court of Cook County are affirmed.

Affirmed.

CAMPBELL and MANNING, JJ., concur.