No. 3--06--0179

Filed February 5, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

THE PEOPLE OF THE STATE OF ILLINOIS,

  Plaintiff-Appellee,

v.

SHERRICK A. NEWBORN,

  Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the Circuit Court
of the 10th Judicial Circuit,
Peoria County, Illinois,

No. 05--CF--987

Honorable
James E. Shadid,
Judge, Presiding.

JUSTICE WRIGHT delivered the opinion of the court:

Defendant was charged with armed robbery as a juvenile. However, after a hearing under section 5–805(3) of the Juvenile Court Act of 1987 (705 ILCS 405/5–805(3) (West 2004)), jurisdiction was transferred to adult court where the State charged defendant with armed robbery under the Criminal Code of 1961 (720 ILCS 5/1–1 *et seq.* (West 2004)). A jury found defendant guilty. The court sentenced defendant to16 years in prison and denied his motion to reconsider sentence. This appeal followed.

On appeal, defendant claims the State failed to prove him guilty beyond a reasonable doubt and the circuit court erred in refusing to allow impeachment of a witness with the witness's juvenile felony adjudications. Defendant also argues the court erred by allowing the State to introduce evidence regarding a shotgun found during the police investigation. We reverse and

remand for a new trial.

BACKGROUND

Immediately before jury selection, defendant informed the court that the State would not provide any information regarding the prior juvenile record of one of the State's key witnesses, Bobby King. Defense counsel advised the court that he desired the information for the purpose of the possible impeachment of King. The prosecutor responded by informing the court that the State was not certain King would be called to testify at defendant's trial. The trial judge granted defendant access to juvenile court records regarding King's delinquency adjudications in two prior 2002 cases. The adjudications involved juvenile felonies.

At trial, Mark Sierra testified that on July 25, 2005, at approximately 3 a.m., he was approached by two young black males while walking near the corner of Humboldt and Griswold in Peoria. According to Sierra, he recognized one of the men as a member of the King family, but he did not know the other man. Sierra initiated conversation with the two young men by advising them to leave the area since he previously observed police units in the neighborhood. The youth Sierra did not recognize then pulled a handgun and told Sierra to "lower it." Sierra understood this phrase as a demand for money. The other youth, whom Sierra recognized as a member of the King family, told his companion that Sierra should not be bothered. Sierra testified that he began laughing and walked away. The unknown youth then discharged his handgun into the air. Sierra threw a $10 bill onto the street, and the two youths fled away from Sierra.

Police officers responded immediately. Sierra explained the encounter to the officers and told them he had observed the youths run into the alley behind Humboldt. Sierra stated that he followed the police in pursuit and saw them enter a residence at 2517 Humboldt, about three

2

houses from the scene of the robbery. As Sierra waited outside, the police subsequently escorted several youths out of the residence and asked Sierra which one robbed him. Sierra said he identified the youth wearing black pants and a grey shirt as the person who discharged the weapon.

During cross-examination, Sierra said he remembered that three young men were escorted out of the house. He recognized one as a member of the King family and another as Tremaine Drummond. He also testified that he did not remember seeing the officers escort defendant out of the house, nor did he recall seeing Ladarius Williams or an individual named Dominick emerge from the residence. During his testimony, Sierra said he was unable to identify the offender because it was dark at the time of the robbery. However, he described the robber as wearing a grey shirt and black pants, approximately 5 feet 9 inches tall, dark-skinned, approximately 150 pounds.

On redirect, when specifically asked if defendant was the person who committed the robbery, Sierra stated, "That's not him." Sierra acknowledged that the day before defendant's trial, defendant's friend, Tremaine Drummond, offered him $1,000 to change his testimony. Sierra said the offer had no effect. However, he admitted that his sister still lived near Drummond's residence at 2501 Humboldt.

Officer Jacob Faw testified that he responded to an unrelated armed robbery complaint in the area of Griswold and Humboldt on July 25, 2005. While on that call, the officer heard a gunshot from the area near the 2500 block of Humboldt. On arrival, he saw Sierra standing in the street. Sierra reported being robbed and said one of the suspects fired a handgun. Faw observed three males standing beside a nearby house. The males fled westbound down the alley behind the

3

2500 block of Humboldt after noticing the officer. As Faw searched that area, Bobby King poked his head out from behind the porch of a residence at 2517 Humboldt. Once King was in custody, Faw found an empty firearm magazine in King's shirt pocket. The magazine was inoperable, because a spring and part of the casing were missing. Faw also heard footsteps and voices from inside the residence that sounded like people running and talking hurriedly. Other officers on the scene saw Dominick Eppinger through a window of the residence. Eppinger allowed them inside and was arrested.

The officers located defendant hiding inside a freezer in the basement. The officers found Ladarius Williams and Tremaine Drummond upstairs. According to Faw, he was standing with Sierra in front of the residence when the police brought defendant, Eppinger, Drummond and Williams outside and illuminated the young men's faces with a flashlight. Faw testified that Sierra looked intently at the individuals as they emerged and immediately identified defendant as the person who robbed him. Faw said there was no hesitation in Sierra's identification of defendant as the perpetrator. Faw testified that defendant was wearing black shorts and a black shirt with short sleeves, and that no one was wearing a grey shirt or black pants. A search of defendant's person revealed a $10 bill in his rear pocket. The police also found a .22-caliber bullet on the sidewalk in front of the residence.

Officer Ken Snow examined the $10 bill found in defendant's pocket and did not find any fingerprints. He did not test the bill for DNA.

Prior to testimony from Bobby King, the State moved to bar questioning about his juvenile criminal record. Defense counsel advised the judge that he intended to impeach King's credibility with two prior juvenile adjudications. Defendant also intended to elicit that King was not charged

4

in the instant case.

The court took judicial notice of King's prior adjudications but would not allow defendant to utilize those adjudications for impeachment purposes. The court noted the absence of case law permitting admission of a prior juvenile adjudication for purposes of impeachment. The court did allow a limited cross-examination as to whether King was charged with any offenses related to the current incident.

King testified that he had known defendant for a couple of years prior to July 25, 2005. At 3 a.m. on that date, he was walking alone, looking for his brother, when he saw defendant on Humboldt. In response to further questioning, King acknowledged spending a couple of hours with defendant on July 24 and 25, 2005. While the two were on Humboldt, Mark Sierra told them the police were nearby. King believed that Sierra was trying to help them avoid getting a curfew ticket. According to King, defendant said, "What?" and pulled out a handgun. Sierra said he only had $10 and dropped the money. King testified that he picked it up and gave it back to Sierra. According to King, Sierra kept dropping the money, and King kept picking it up and giving it back to him. Defendant ultimately said, "Fuck it," and fired the handgun into the air.

King and defendant then ran to the Drummond residence. King hid under the porch where the police found him. King stated defendant ran inside the house through the front door. After Sierra informed the police that King had nothing to do with the robbery, the police entered the house and removed defendant, Drummond and Eppinger from the house. King was present at the scene that night when Sierra identified defendant as the robber. According to King, when Sierra informed the police that defendant had his money, officers removed $10 from defendant's back pocket and gave it to Sierra.

King said he found the inoperable ammunition clip recovered from his pocket on the corner of Humboldt and Griswold just before the incident. King did not know if the clip belonged to the handgun defendant shot into the air. King indicated that his fingerprints may have been on the gun. He testified that a couple of days prior to the incident, an individual named "Terrell" tried to sell him the same handgun that defendant shot into the air. He also explained defendant showed him the gun a day after "Terrell" tried to sell the same gun to him. King said he saw the gun in defendant's possession on July 25, 2005, but he thought defendant had left it at home prior to the incident. He admitted he had the broken clip in his hand when Sierra mentioned having only $10.

King testified on cross-examination that the police interviewed him twice and warned, "It's either you or Sherrick that did this. Tell us who did it." He also acknowledged telling defendant, "It was either you or me." Although he did not face charges for the current incident, King said he was charged with possession of a firearm because he admitted he held the gun earlier when "Terrell" tried to sell it to him.

King testified that he did not fire the handgun, he did not rob Sierra, and when police officers exited the house, they brought out the gun that was used in the robbery. The parties stipulated, however, that the weapon from the robbery was not found inside the house. King denied any agreement to testify for the State.

Defendant testified on his own behalf. He said he lived with his mother at 1612 South Arago on July 25, 2005. He and Bobby King were together between 3:30 and 4 p.m., and then from 6 p.m. on July 24, 2005, until they were taken into custody on July 25. According to defendant, Ladarius Williams and Tremaine Drummond arrived at defendant's house around

6

midnight . At about 1 a.m., they all walked to Drummond's house at 2517 Humboldt, where defendant intended to stay the night. Defendant's mother was home when he left the house, but he did not tell her that he was leaving.

Defendant said he did not have a handgun on July 25, 2005. Defendant saw a .22-caliber gun in King's hand while the two were at defendant's house. Defendant had not seen King's gun on any prior occasion.

Defendant testified that Ladarius Williams had a .25-caliber handgun with him that night at Tremaine Drummond's house. Defendant did not see where Williams carried the .25-caliber gun. After arriving at Drummond's, defendant and Drummond played video games upstairs while Bobby King sat on the bed. Williams and Eppinger were also in the house. Haywood Drummond was asleep in another room with his girlfriend. Defendant, King, and Drummond eventually went downstairs to get something to eat. Then, while Drummond, Eppinger, King, and Williams were in the living room, defendant called home and used the bathroom upstairs. He testified that when he came back downstairs, everyone was running around. He followed Drummond to the side door leading to the basement, and when he looked out the window of the door, he saw flashing lights. Defendant felt the doorknob turn and jumped backward down the stairs. In the basement, he felt the side of a deep freezer that was turned off, opened it and climbed in. After about 30 seconds, police officers removed him from the freezer and took him outside.

Defendant further testified that when the police asked Sierra if he was the robber, Sierra looked at him and nodded affirmatively. Williams, King, Drummond, and Haywood Drummond's girlfriend were outside when Sierra identified defendant. Defendant was wearing a black tank top and blue jean shorts. Defendant said he had not seen Sierra before he observed him outside the

7

house that evening. The police searched his pockets. At that time, he had $22: $6 in his right front pocket, $6 in his left front pocket, and a $10 bill in his rear pocket. He said the money in his front pockets was for his sisters, and the money in his rear pocket was his own. Defendant testified that he was not with Bobby King at the corner of Humboldt and Griswold with a gun, and he did not hear any gunshots that night.

Kevin Kennedy, a supervisor at the Peoria County Juvenile Detention Center, testified that he met defendant sometime between 7 a.m. and 3 p.m. on July 25, 2005. At that time, defendant was dressed in blue jean shorts and a black tank top.

Sheila Biles testified that she was defendant's mother and lived at 1612 South Arago. On July 24, 2005, defendant and Bobby King were in and out of the house from early evening on July 24 to early morning the next day. The last time she saw defendant was between 11:30 p.m. and a little past 12 a.m. with King, Ladarius Williams, and Tremaine Drummond. Defendant was dressed in blue jean shorts and a black tank top.

In rebuttal, Mike Bornsheuer, an investigator with the Peoria County State's Attorney's office, confirmed that Biles told him defendant was home between 3 and 3:30 a.m. on the morning of the offense. The State also re-called Officer Faw, who testified that police officers found a shotgun in the residence at 2517 Humboldt. The shotgun was concealed under a couch cushion in the living room, and pictures of the gun were admitted into evidence.

The jury found defendant guilty as charged, and he appeals.

ANALYSIS

Defendant first contends the State failed to prove him guilty beyond a reasonable doubt because there was no physical evidence connecting him to the offense, the victim recanted his

identification of defendant, and Bobby King, the only other occurrence witness, testified falsely.

When considering a challenge to the sufficiency of the State's evidence, our role is to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). It is not our province to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001) (noting that the trier of fact determines witnesses' credibility). After a guilty verdict, all of the evidence is considered on appeal in the light most favorable to the prosecution. *People v. Migliore*, 170 Ill. App. 3d 581, 592 (1988). Accordingly, we will not set aside a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

In the instant case, defendant claims the State's evidence was insufficient to prove that he was the individual who pulled the gun on the victim. Having carefully reviewed this claim, we disagree.

The victim testified that two youths were present during the robbery. The victim stated one of them belonged to the King family and was not the perpetrator. Moments after the incident, the victim identified defendant as the robber for police officers while standing outside the Drummond residence. At trial, defendant testified that he was the person identified by the victim as the perpetrator. Officer Faw corroborated this evidence, adding that the victim made the identification without hesitation on the night of the occurrence.

Defendant admitted during his testimony that he was with King at 3 a.m. on July 25, 2005. Bobby King's testimony indicated that defendant was the individual with the gun at the

time of the robbery. The jury also learned that the police found defendant in the basement of the Drummond residence hiding inside a freezer. Evidence of flight may be considered as a factor tending to establish guilt. See *People v. McDonald*, 168 Ill. 2d 420, 448 (1995). Additionally, the evidence showed that the victim threw a $10 bill on the ground after the robber fired the gun, and police officers subsequently found a $10 bill in defendant's back pocket.

Considering the jury's role as fact finder, and viewing the instant facts in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant was the individual with the gun during the robbery.

Next, defendant claims the circuit court erred in barring evidence of Bobby King's juvenile felony adjudications for purposes of impeaching King, who was either an occurrence witness or a participant in the crime. The State argues that a new trial is not required because the court's error was harmless beyond a reasonable doubt, and defendant adequately attacked King's credibility with other evidence. The State does not contend that the evidence of defendant's guilt was overwhelming or that the requested impeachment evidence duplicated other evidence.

Contrary to the court's ruling in this case, evidence of adjudications from juvenile proceedings may be admitted in a criminal proceeding for purposes of impeaching a witness. 705 ILCS 405/5–150 (West 2004). In *People v. Montgomery*, 47 Ill. 2d 510, 517 (1971), the Illinois Supreme Court acknowledged:

> " 'Evidence of juvenile adjudications is generally not admissible ***. The judge may, however, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the judge is satisfied that admission in evidence is necessary for a fair

10

determination of the issue of guilt or innocence.' " *Montgomery*, 47 Ill. 2d at 517,

quoting Federal Rule of Practice and Procedure No. 609 (d), 51 F.R.D. 391(d) (1971).

Factors to be considered in determining whether the proposed impeachment evidence should be admitted include the nature of the crime, nearness or remoteness of the offense, the subsequent career of the witness, and whether the crime was similar to the one on trial. *Montgomery*, 47 Ill. 2d at 518.

In this case, the trial court did not consider whether the offenses that formulated the basis of King's delinquency adjudications could have been used to impeach his credibility had they been committed by King as an adult offender. Nor did the court consider whether the evidence was necessary to fairly determine defendant's guilt or innocence. Simply stated, the trial court did not exercise its discretion by considering the *Montgomery* factors before ruling on defendant's request to introduce King's 2002 juvenile felony adjudications as impeachment. Instead , the court foreclosed the defendant's attempt to impeach King with his prior juvenile felony adjudications based on the court's mistaken belief that such evidence was not admissible as a matter of law.

We recognize a trial judge's decision to deny an inquiry into a witness's prior juvenile adjudications following a *Montgomery* analysis is within the court's discretion and subject to a deferential abuse-of-discretion standard of review. See *People v. Wright*, 234 Ill. App. 3d 880, 893-94 (1992); *People v. Berberena*, 265 Ill. App. 3d 1033, 1049-50 (1994). However, this trial court completely bypassed the *Montgomery* analysis based on a misperception of the law. When a court is required by law to exercise discretion, the failure to do so may itself constitute an abuse of discretion. Regardless, the case law provides that when the trial court completely fails to

11

consider the *Montgomery* factors, the failure to exercise discretion precludes our deferential review. See *People v. Whirl*, 351 Ill. App. 3d 464, 467 (2004). Therefore, we review the issue *de novo.*

The State relied heavily on the credibility of Bobby King as the sole witness to identify defendant as the offender because the victim's in court testimony exonerated this defendant. Since the court excluded King's prior juvenile adjudications as a matter of law, we do not know the nature of the offenses resulting in the adjudications of delinquency. Consequently, we are unable to determine from the record whether King's juvenile felony adjudications would have constituted probative evidence on the issue of his credibility as a witness.

However, King's version of the robbery was inconsistent with the victim's recollection of the offense. King testified he repeatedly picked up Sierra's money and handed it back to him at the scene of the robbery. Sierra testified he turned away laughing at the youths' demand for his money, without complying with their request to produce cash until after the gun was fired. Significantly, King admitted during his testimony that his fingerprints might be found on the gun because he previously handled the gun on another occasion.

Although we have concluded that the evidence was sufficient to sustain defendant's conviction, we cannot say that the court's mistaken ruling prohibiting the attempt to impeach King with his two prior juvenile adjudications did not affect the jury's verdict. See *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981). If the court had allowed the evidence after properly weighing the *Montgomery* factors, the jury would have learned of King's prior felony offenses committed during his status as a juvenile. This additional evidence could have potentially caused the jury to further scrutinize and then reject King's identification of defendant as the shooter.

12

Therefore, we cannot agree with the State's position that the court's exclusion of this impeachment evidence as a matter of law was harmless beyond a reasonable doubt. Accordingly, the cause must be remanded for a new trial. See *People v. Triplett*, 108 Ill. 2d 463, 486 (1985).

Defendant also claims he is entitled to a new trial because the circuit court erroneously allowed the State to introduce evidence during its rebuttal that police officers found a shotgun inside the Drummond residence. Our disposition of the foregoing evidentiary issue renders further consideration of this issue unnecessary. See *Montgomery*, 47 Ill. 2d at 511.

CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court of Peoria County and remand the cause for a new trial.

Reversed and remanded.

O'BRIEN, J., concurring.

JUSTICE HOLDRIDGE, dissenting:

I disagree with the majority's conclusion that reversible error occurred on the impeachment issue. In People v. Montgomery, 47 Ill. 2d 510 (1971), the Illinois Supreme Court explained that although evidence of juvenile adjudications is generally not admissible, a judge may allow such evidence pertaining to a witness other than the accused if (1) a conviction for the offense would be admissible to attack the credibility of an adult, and (2) the judge finds that admission is necessary to fairly determine the question of guilt or innocence. These observations implicate the constitutional right to confront witnesses. Regarding this right, the United States Supreme Court has explained that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to

13

whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (1985). Accordingly, when a judge improperly denies a defendant the opportunity to cross-examine a witness regarding bias, reversal is not automatic because such error may be harmless. People v. Kliner, 185 Ill. 2d 81 (1998).

The instant ruling falls under the category of harmless error. People v. Wilkerson, 87 Ill. 2d 151 (1981), cited by defendant, is instructive by way of distinction. Wilkerson involved a witness, other than the accused, who had several charges pending against her when she testified for the State at the defendants' trial. "The prosecutor in her case, who at one time was the prosecutor in the Wilkerson case, told [her] that after the Wilkerson case was completed, he 'would be in touch with her. [He] would be in contact with her lawyer and try to work something out *** to see what could be worked out.'" Wilkerson, 87 Ill. 2d at 155. The defendants tried to impeach this witness with evidence of her pending charges, aiming "to convey to the jury that she might be trying to curry favor with the prosecutor of those charges by slanting her story in the Wilkerson case to suit the State." Wilkerson, 87 Ill. 2d at 155. The trial judge disallowed the evidence, and the Illinois Supreme Court found reversible error.

Unlike Wilkerson, the instant facts show that the jury heard evidence of Bobby King's behind-the-scenes involvement with the State. On cross-examination, defense counsel attacked King's credibility by eliciting testimony from King that the police interviewed him twice and warned, "It's either you or Sherrick that did this. Tell us who did it." King also acknowledged telling defendant, "It was either you or me." Under the same cross-examination, King revealed that the State's Attorney's Office told him that defendant would try to show that he (King) had committed the robbery. Thus, despite the ruling in question, defendant was allowed to present

14

evidence supporting his claim that King had a motive to lie. Defense counsel reiterated this point during closing arguments, asserting that King implicated defendant through a deal with the State to save his own skin. Counsel urged the jury to disbelieve King, "who's into it up to his neck, who's somehow responsible for this, and is probably the person that had the gun." Moreover, the jury was instructed that in judging the credibility of witnesses, it could consider any interest, bias, or prejudice a witness may have.

Beyond evidence of motive to lie, defense counsel elicited further impeachment testimony from King. For instance, it was under counsel's questioning that King admitted that his fingerprints may be on the gun used during the robbery. This point was also emphasized during closing arguments. Moreover, the court received a stipulation that police officers never recovered the gun from the Drummond residence. This stipulation impeached King's testimony that he saw officers bring the gun out of the residence.

Under these circumstances, I believe defendant received an effective opportunity to make his point about King's credibility. The jury understood the point but still found King credible as to who pulled the gun on the victim. This finding was reasonable in light of its consistency with other evidence of record (including defendant's own testimony that the victim identified him as the robber). Telling the jury about King's juvenile adjudications would not have changed that evidence.

Accordingly, I respectfully dissent from the majority's disposition.