No. 3–08–0051

Opinion filed March 14, 2011

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2011

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06–CF–1579 |
| VICTOR RUSSELL, | ) ) | Honorable Stuart P. Borden, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgement of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion, and joins Justice Holdridge in the special concur.
Justice Holdridge specially concurred, with opinion.

**OPINION**

On December 19, 2006, the State charged defendant Victor Russell by indictment with four alternate counts of first degree murder (720 ILCS 5/ 9-1(a)(2) (West 2004)) alleging defendant, without legal justification, knowingly did acts that caused the death of Carla Spires. A jury found defendant guilty of first degree murder. On January 11, 2008, the court sentenced defendant to 50 years in the Illinois Department of Corrections (DOC) after denying defendant's motion for new trial. Defendant filed a timely notice of appeal.

On appeal, defendant argues that the State did not prove that he committed the murder beyond a reasonable doubt. Additionally, defendant contends that the trial court committed reversible error when it failed to individually question the jurors regarding the principals required by Supreme Court Rule 431(b). Ill. S. Ct. R. 431 (eff. May 1, 2007).

We affirmed the decision of the trial court on November 18, 2009. Defendant appealed to our supreme court which, in light of the postopinion case of *People v. Thompson*, 238 Ill. 2d 598 (2010), ordered this court to vacate its earlier judgment and reconsider its decision to determine if a different result is now warranted. In light of *Thompson*, we affirm the trial court's decision. *Thompson*, 238 Ill. 2d 598.

We affirm.

FACTS

On December 8, 2006, the State filed an information, followed by a subsequent indictment on December 19, 2006, charging defendant Victor Russell with four alternate counts of first degree murder. Count I alleged defendant, without lawful justification and with intent to kill Carla Spires, knowingly cut Carla Spires on the neck with a sharp object thereby causing the death of Carla Spires pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1) (West 2004)). Count II alleged defendant, without lawful justification and with the intent to do great bodily harm to Carla Spires, cut Carla Spires on the neck with a sharp object thereby causing the death of Carla Spires pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1) (West 2004)). Count III alleged defendant, without lawful justification, knowingly cut Carla Spires on the neck with a sharp object knowing said act created a strong probability of death to Carla Spires thereby causing the death of Carla Spires pursuant to section 9-1(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(2) (West 2004)). Count IV alleged

2

defendant, without lawful justification, knowingly cut Carla Spires on the neck with a sharp object knowing said act would create a strong probability of great bodily harm to Carla Spires thereby causing the death of Carla Spires pursuant to section 9-1(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(2) (West 2004)).  Defendant demanded a trial by jury, which began on October 22, 2007.

Only those portions of *voir dire* relevant to the issues at bar are included in this statement of facts.  The court's introductory statement to the entire potential jury panel included:

> "The defendant is to be presumed innocent of the charge in the indictment, and this presumption remains throughout the trial with the defendant until you've been satisfied by the evidence beyond a reasonable doubt as to the guilt of the defendant, and the burden of proving the guilt of the defendant beyond a reasonable doubt is on the State.  The law does not require the defendant to prove his innocence.  The defendant is not required to present any evidence or testify.  If he chooses not to testify in this case, it cannot be held against him."

The judge also informed the jurors that he would give written instructions to them at the close of the case. The judge stated that it would be their "absolute duty to accept the law as defined in these instructions and to follow the court's instructions of law."

During the individual questioning of the jurors, the court asked each potential juror, in part, the following questions with minor variations from juror to juror: whether the juror had any bias against a person simply because he has been charged; whether the juror would follow the court's instructions regarding the law; whether the juror would decide the case without sympathy and prejudice; whether the juror would be able to give both the State and the defendant a fair

3

trial; and whether the juror would wait until the end of the entire case before forming a final opinion about the verdict. During questioning of the various potential jurors, the court also randomly asked additional questions.

When questioning the first impaneled juror, after the court asked the question about waiting until the end of the entire case before forming a final opinion, the court also explained:

"The reason I ask that is you will find out the State has a burden of proof. They always have the burden of proof. They will put on evidence. The defendant may put on evidence. If the defendant does put on evidence, there could be rebuttal evidence. It could go back and forth a little bit. What I'm asking you to do is to withhold any opinion about the verdict until the case is completely over and you are back deliberating with your fellow jurors, and you indicated you would do that?"

The court expounded on some similar issues while questioning other potential jurors.

During *voir dire*, the prosecutor asked some, but not all, of the potential jurors whether they would be able to sign a guilty verdict if they found the State had proven its case beyond a reasonable doubt and, likewise, whether they would be able to sign a not guilty verdict if they found the State had not proven its case beyond a reasonable doubt. Defendant's attorney did not ask any questions of the jurors relevant to Supreme Court Rule 431(b).

After opening statements, the State called Samuel Stevens as its first witness. He testified that he was an emergency medical technician on December 5, 2006, and responded to a call at 1321 Martin Luther King Drive in Peoria, Illinois. He stated, when he arrived at the scene and walked around the front of a car, he located a female, later identified as Carla Spires (Spires), located between the "stairs coming down" and the car. Upon further observation, he stated he

4

observed several deep lacerations to her neck, her body was cold, and he determined that she was dead.

Kelly Williams, Spires' niece, stated Spires dated defendant "off and on approximately two to three years." Williams testified that she called defendant's cell phone at approximately 7:22 p.m. on December 5, 2006, and spoke to defendant and then spoke to Spires. On that evening, she said Spires' 12-year-old daughter, Rosaliyn Artis-Spires (Rosaliyn), was helping her move. At approximately 10 p.m. on that evening, Williams drove Rosaliyn back to Spires' residence and, when Rosaliyn got to the steps of the residence, she ran back to Williams' car screaming that something was wrong with her mom. When Williams got out of her car, she saw Spires and called 911.

The next witness, 15-year-old Secura Rutherford (Secura), testified that on December 5, 2006, she lived across the street from Spires' house. She stated, between 7 and 8 p.m. on that date, she heard screaming and looked out her window and saw a black man and a Caucasian lady on the stairs across the street. She said the man wore a "tannish" coat, a "skullcap," and dark jeans. She said she recognized the man and the woman because they lived across the street and she saw them come and go. She said she had seen both of them outside shoveling at their residence the day before the incident, and she recognized them as the same male and female.

Secura said the man and woman were "kind of wrestling" and he was pulling her downstairs with his back to her window. She testified he "kind of lost [his] grip and he fell down the stairs, got back up and pulled her down." She said when the man pulled the woman down, they were on the other side of the car for a while, but she could not see them because the car blocked her vision. At that point, she said she closed her window. After about 10 or 15 minutes, she testified, she looked outside again. Then, she saw the man walk toward the car, pick

5

something up, walk away from the car, and then, in an underhand motion, throw what "looked like it was a knife or something" near the woods by the garbage cans. She testified that the man then walked up the street to where she could no longer see him, toward "Western" (Avenue). She said she did not see the woman again after the man pulled her down and out of her view by the side of the car.

Secura said she went to the police station on that evening around 1 a.m. and looked at a photo lineup. She testified that she was unable to identify anyone in that photo lineup. When shown the lineup photographs in court, Secura said she now saw defendant's photo in the lineup. Secura stated that she usually sees defendant in a skullcap or an "afro" and the photo lineup showed defendant wearing braids. Secura also testified that she gave a videotaped statement to the police at that time. Secura said the next day she again went to the police station and looked at an "in-person" lineup and she identified defendant as the man struggling with the Caucasian woman the previous night. She testified that she had no doubt in her mind that the man in the in-person lineup was the same man she saw pull the woman down the stairs on December 5, 2006. She testified that she could see the two people clearly on December 5 because Spires had a light shining outside. She clarified that defendant was wearing the same jacket and hat on December 5 that he wore the previous day when he shoveled snow. Secura then identified defendant, in court, as the man she saw struggling with the female on the night of December 5.

The next witness, Becky Rutherford (Becky), testified that on December 5, 2006, she and her daughter, Secura, had been living with her mother at 1322 Martin Luther King Drive for a couple of weeks. On December 5, 2006, Becky noticed a black man walk past her window around 7 or 8 p.m. while she was watching television. She said he was 5 feet 5 inches or 5 feet 6 inches tall, stocky, and wearing a brown jacket, a dark skullcap, and jeans. She observed him

6

walk by heading "toward Western" (Avenue) patting the pockets of his pants. She then observed him turn around and walk back "toward MacArthur" (Highway) which was toward Spires' house. Becky stated the man walked out of her view from the window, he then reentered her view and was again heading toward Western Avenue, where he walked down a side street several blocks away and out of her view. The witness testified that she had previously seen this man a couple of days earlier shoveling snow with a Caucasian female at the house across the street from her residence. She said she had a conversation with him on that date and recognized him.

Later that evening, Becky said, she and her daughter went to the police station to give a statement. She said the police separated her from her daughter and took a videotaped statement from her that evening. The police also showed her a photo lineup and she could not identify anyone in the photographs. She said she and Secura returned to the police station the next day to look at an "in-person" lineup. During the in-person lineup, Becky said, she identified defendant as the man who walked past her window the previous evening. While testifying, Becky stated that she had only seen defendant three times prior to that evening and, each time, he always had the skullcap on his head. She said she did not recognize him in the photo lineup because his hair was different. Becky identified defendant, while in the courtroom, as the same person she observed walking past her window on December 5, 2006. Becky stated that she did not see defendant's van on December 5, 2006.

Police officer Kenneth Snow testified that he was the crime scene technician assigned to the Spires case. He stated that he was called to the Spires' residence on December 14, 2006, where he recovered a folding box cutter approximately 20 feet into the wooded area behind the house and about 180 feet west of the staircase leading from the house to the garage. He said the box cutter had a folding blade and some visible hairs and blood on it.

7

Detective Shannon Walden testified she conducted the in-person lineup at the police station on December 6, 2006, regarding the Spires murder investigation. During this lineup, Walden said, she took Becky, individually, into the viewing room, and Becky identified defendant out of the lineup. Next, she took Secura separately into the viewing room, and Secura identified defendant out of the lineup.

The State then called Rosaliyn Spires, the victim's 12-year-old daughter, to testify. Rosaliyn stated that approximately a month before her mother died, she woke up from sleeping and heard defendant and her mother arguing. She went downstairs and saw her mother on the floor between the doorway and "he was like pulling her outside." She further explained that her mom was in the living room on the floor and defendant was dragging her outside by the arms. Rosaliyn stated that she told defendant to let go of her mother, and he released her. She said she observed scrapes on her mother's knees after that incident.

John Peters testified that he knew Spires because they worked at the Caterpillar facility, and they occasionally socialized together. Peters recalled an incident that occurred on June 3, 2006, outside his parents' house in the early morning hours after Spires, defendant and Peters had been out drinking that evening. Around 1 to 2 a.m., defendant took out a pocketknife to clean his fingernails. Peters mentioned that his son collected knives, and defendant handed the folding pocket knife to Peters. After returning the knife to defendant, Peters said defendant stood up, looked at Spires, and while putting the knife in his pocket said, "If I can't have you nobody will."

Dr. Violette Hnilica, a forensic pathologist, testified she performed an autopsy on Spires on December 6, 2006. Hnilica stated that she examined Spires' body and concluded the fatal wounds were the slash marks to the neck. Specifically, she described the uppermost slash, running 10 ½ inches long and 4 ½ inches deep, from the left neck to the right side, cutting

8

through the carotid artery, the jugular vein, the larynx cartilage and the right ear, and stated it was the cause of death. There were at least three other slash marks on the neck, measuring 5 3/8 inches, 5 3/8 inches, and 5 inches in lengths, and all starting on the left side and ending on the right side of the neck. Dr. Hnilica stated she also observed other cuts, contusions and abrasions, including: a contusion on the left side of the face; a contusion on the left side of the scalp where hair had been pulled out; a two-inch long cut on the left shoulder; tiny scrapes on both elbows; bruises on the hands; and several scrapes in several different directions on the back side of the body. She concluded all of these injuries occurred before death. There were 12 different bruising sites, scattered all over the head, involving the scalp and the fascia tissue under the scalp.

The State then showed Dr. Hnilica a utility knife belonging to Spires, and the witness stated, in her expert opinion, that the knife possibly could have caused all of the wounds, including the deepest wound, if Spires' head was forcefully pulled back by grabbing her hair, consistent with some of Spires' hair being pulled out, and then forcefully using the utility knife across her neck. During cross-examination, though, the doctor testified that Spires' utility knife was not typically "the kind of knife that would cause a ten-inch, four and a half inch deep wound." The State then showed Dr. Hnilica the knife recovered from defendant's person at the time he was arrested, and she determined that that knife could have made the wounds, but most likely did not cause the injuries because the serrated edge would have left some serration patterns in the cuts, which were not present. The doctor opined that neither of those knives was the likely cause of Spires' fatal injuries.

Gail Jackson testified that she was working at a bar called "Slickers" on December 5, 2006. She said she had known defendant as an acquaintance for years. She said she also knew

9

Spires because they both were bartenders at different bars and occasionally ran into each other. She said she saw defendant and Spires walk into Slickers on December 5, 2006, sometime between 6:30 and 8:30 p.m. She recalled they walked into the bar separately, about five minutes apart. She said Spires ordered a drink and stood and watched a game of pool. When defendant arrived, he ordered a drink and stood by the dart machine. After a short time, she saw defendant approach Spires and it looked "like there was little altercation" between them. She explained that defendant got a little loud when talking with Spires, and she walked away from him.

A little later, Spires approached the bar to order a drink. About five minutes later, defendant came over near Spires and also ordered a drink. Jackson testified that she overheard defendant say loudly to Spires, "If you don't want me just tell me." Jackson stated Spires just sat there and was very quiet. The next thing Jackson noted was that both defendant's and Spires' seats were empty, and she did not see them again that evening.

Jackson said they looked like they had just gotten off of work at Caterpillar because they were wearing their Caterpillar name tags around their necks. Jackson said defendant wore a dark jacket that evening but was not certain about the color. She said he did not wear a hat, and his hair was braided.

The parties stipulated Laciya Spires would testify that she is Spires' daughter. On December 14, 2006, she walked in the wood line near the residence on Martin Luther King Drive when she noticed a red-colored knife at the base of a tree. When she looked more closely at the knife, she noticed the blade was partially open and there was some type of substance on the blade. She said she did not touch the knife and immediately ran back to the house and called the police. Laciya would testify that she called defendant's cell phone on December 5, 2006, at 7:50 p.m. and spoke to both defendant and Spires, and they told her they were at Slicker's bar.

10

The parties stipulated that if Detective Katie Baer testified, she would state that when she and Detective Ron Gibbons interviewed Secura and Becky Rutherford at the police station on December 6, 2006, Secura and Becky were both present together during the interviews. Baer would testify that they were not together when police showed them the photo lineup.

Finally, the State called Officer Eric Ellis, who testified he acted as a crime scene technician at the 1321 Martin Luther King Drive residence on December 5, 2006. He stated he took photos of the scene from across the street near the Rutherford residence, which showed floodlighting outside the 1321 Martin Luther King Drive address. On December 6, 2006, he photographed defendant at the police station and observed vertical scratch marks located on defendant's lower left leg. He said he examined all of the clothing taken from defendant on December 6, 2006, and found no evidence of blood on those items. The State rested after this witness, and the court denied defendant's motion for directed verdict.

Phyllis Russell, defendant's mother, testified that defendant lived with her and her ex-mother-in-law on December 5, 2006. On that date, Russell stated that she saw defendant between 2:30 p.m. and 3:30 p.m. at the Peoria post office on State Street. At that time, Ms. Russell said defendant wore a black hat with a brim and his steel-toed work shoes. She stated she did not see defendant again on December 5.

She testified that at approximately 9:30 p.m. on December 5, she woke up and noticed that the van, driven primarily by defendant, was parked in the driveway at her residence. Russell stated that, around 9:30 to 9:45 p.m. on December 5, 2006, the police came to the house looking for defendant but did not locate him. Ms. Russell testified that the van was no longer in the driveway around 6 or 7 a.m. on December 6 when she woke up.

Catherine Jones testified that defendant was the father of her two children. On December

11

5, 2006, she attempted to call defendant around 5 p.m. and 8 p.m. but did not reach him. She said defendant returned her call "a little before 9:00 p.m." from his house phone. During that conversation, defendant asked her if she would call him early on December 6 to make sure he woke up for work. She said, after that phone call, she drove over to his residence to pick him up around 9:10 p.m. on December 5. At that time, defendant was wearing dark, faded black jeans, a black or blue shirt, and brown or tan casual shoes, and he did not wear a jacket or coat that evening. She did not recall whether defendant wore a cap at that time. She stated she took him back to her residence, where he stayed the entire night until she left for work on December 6, 2006, around 3:45 a.m. At that time, she took defendant back to his vehicle at 1914 Broadway.

Jones testified that defendant paid her $100 to $200 for child support every Friday to every other Friday. The parties presented a stipulation that defendant's cell phone records verified that Jones made a cell phone call to defendant's cell phone at 8:55 p.m. that lasted 26 seconds.

The parties rested and counsel presented their closing arguments. The court then instructed the jury as to the law, including the required jury instructions as set forth under the pattern jury instructions pertaining to Rule 431(b) principles. After deliberation, the jury found defendant guilty of first degree murder. Defendant did not file a posttrial motion. On January 11, 2008, the court sentenced defendant to a 50-year commitment to the Illinois Department of Corrections. Defendant appealed his conviction.

ANALYSIS

Defendant raises two issues on appeal. First, defendant contends that the State provided insufficient evidence to prove that defendant murdered Spires beyond a reasonable doubt. Second, defendant contends that the trial court failed to comply with Supreme Court Rule 431(b)

12

(Ill. S. Ct. R. 431 (eff. May 1, 2007)), resulting in prejudice and asks that defendant be granted a new trial.

The State asserts the evidence established defendant's guilt beyond a reasonable doubt. Additionally, the State argues that defendant has forfeited the court's noncompliance with Supreme Court Rule 431(b) because defendant did not object during the course of *voir dire* and did not include the issue in a posttrial motion. The State also argues, in the alternative, that the judge did not commit reversible error under the plain error doctrine.

A. Sufficiency of the Evidence

The due process clause of the fourteenth amendment requires the State must prove, beyond a reasonable doubt, every element necessary to constitute the crime with which a defendant is charged. *People v. Cunningham,* 212 Ill. 2d 274, 278 (2004) (citing *In re Winship,* 397 U.S. 358, 364 (1970)). When considering a challenge to the sufficiency of the State's evidence, the reviewing court's function is to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Cunningham,* 212 Ill. 2d at 278. This standard of review requires the reviewing court to allow all reasonable inferences from the record in favor of the prosecution. *Cunningham,* 212 Ill. 2d at 280. However, it is not the province of the reviewing court to retry a defendant but to determine " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " *Cunningham,* 212 Ill. 2d at 278 (quoting *Jackson v. Virginia,* 443 U.S. 307, 318 (1979)); *People v. Newborn*, 379 Ill. App. 3d 240, 247 (2008). The reviewing court will reverse a conviction only where "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

13

In this case, defendant only challenges the sufficiency of the State's evidence regarding the element of identification that he, in fact, was the individual who caused the death of Spires. To support this argument, defendant stresses that he did not confess to killing Spires nor did he make any statements connecting him to this crime. Further, defendant points out that the police did not find Spires' blood on defendant's clothing or in defendant's van, and did not recover any fingerprints from the box cutter knife.

Although there was no physical evidence linking defendant to the crime scene, the State presented eyewitness testimony and circumstantial evidence to prove its case. First, the State produced Secura Rutherford, who testified that she heard screaming on December 5, 2006, "sometime between 7:00 and 8:00 p.m." According to Secura, when she looked out of her bedroom window, she observed defendant "wrestling" with Spires on the steps and then he "kind of lost grip and he fell down the stairs, got back up and pulled her down." Secura said she recognized defendant because she had seen him shoveling snow at Spire's residence a day or two earlier. She said he was wearing a "tannish" coat, a "skull cap," and dark jeans. Secura said she lost sight of what was happening when Spires and defendant fell to the side of the car because the car blocked her vision. Consequently, she stopped looking out the window. Several minutes later, Secura returned to the window and observed defendant pick something up, which looked like a "knife or something," near the car and throw it near the woods by the garbage cans.

Another witness, Becky Rutherford, also placed defendant at the scene of the crime on the evening of December 5, 2006. Becky testified she noticed a black man, whom she identified as defendant, walk back and forth past her window around 7 or 8 p.m. while she was watching television. She also described his clothing as a brown jacket, a dark skullcap, and jeans. Although neither witness could identify defendant from a photo lineup, the next day they both

14

separately and positively identified defendant during an in-person lineup as the person they saw the evening before at the Spires' residence.

Additionally, the jury heard Rosaliyn Spires testify that she witnessed a physical altercation between defendant and Spires one month prior to Spires' death. During this incident, Spires was on the floor and defendant was trying to drag Spires out the front door by grabbing her arms. Another witness, John Peters, testified that he, Spires, and Jackson socialized together on June 3, 2006. On that date, Peters overheard defendant tell Spires, "If I can't have you, nobody will." Peters testified that defendant was putting away a pocket knife at the time he made this statement to the victim on June 3, 2006. Further, Gail Jackson, the bartender at Slickers bar, testified that she saw defendant and Spires separately enter the bar around 6:30 p.m. on December 5, 2006, and she noticed defendant speak loudly to Spires before Spires walked away from him. A little later, Spires approached the bar to order a drink, defendant then also approached the bar, and Jackson heard defendant loudly say, "If you don't want me, just tell me."

After considering all of the evidence in the record in a light most favorable to the prosecution, we conclude that the jury could reasonably find beyond a reasonable doubt that defendant killed Spires on the evening of December 5, 2006. Accordingly, we hold that the evidence was sufficient to sustain the conviction in this case.

### B. Forfeiture of Issue - Supreme Court Rule 431(b)

Defendant claims the trial court committed a *per se* reversible error that denied his right to a trial by an impartial jury because the trial court failed to strictly comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431 (eff. May 1, 2007)).[1] At trial, defendant did not object to the

---

[1]Initially, the State contends that defendant waived or forfeited this issue on appeal because defendant failed to discuss plain error in his appellate brief. Defendant's initial appellate

15

sufficiency of the court's inquiry of each juror during *voir dire*. Similarly, defense counsel did not offer questions that the court refused. Nonetheless, defendant claims that reversible error arose when the trial judge failed to strictly comply with the mandates of Supreme Court Rule 431(b), as amended. (Ill. S. Ct. R. 431 (eff. May 1, 2007)).

The State claims defendant has forfeited the error by failing to object during the process of *voir dire* and by failing to include it in a posttrial motion. Additionally, the State submits that plain error does not exist in this case because the error did not deny defendant a fair trial. We review *de novo* issues concerning the application of a supreme court rule. *People v. Reed*, 376 Ill. App. 3d 121, 125 (2007).

The amendment to Rule 431(b) became effective on May 1, 2007, and the jury trial in this case began on October 22, 2007. Prior to the amendment, the trial court was not required to individually question each juror unless requested to do so by defendant or defense counsel. Ill. S. Ct. R. 431(b) (eff. May 1, 1997). Although our supreme court elected to place the duty squarely on the shoulders of the court to comply with the directive contained in the current Supreme Court Rule 431(b), the amended rule does not alleviate either counsel for the State or counsel for the defense of an obligation to object when a trial judge inadvertently overlooks the applicability of Rule 431(b).

---

brief argues that the trial court's failure to comply with Rule 431 is "reversible error." Additionally, defendant argued in his brief that the State's "case against defendant was not strong" and the court's failure to comply with Rule 431(b) in this case "was particularly prejudicial."Although not specifically called "plain error" in his brief, we conclude defendant sufficiently argued the elements of the plain error doctrine so as not to forfeit the argument on appeal.

16

There are significant and serious potential consequences for a failure to bring issues arising under Rule 431(b) to the attention of the trial judge. The failure to object in the lower court may result in waiver of the error by the defense under certain circumstances. Equally serious, the State's failure to object to the court's inadequate *voir dire* procedures may result in a reversal of a conviction on review when the evidence below was closely balanced. Thus, all parties and the judge must take care to insure the rule is followed.

### 1. *Per se* Violation

Defendant argues that failure to comply with the amended rule constitutes a *per se* violation requiring a reversal. In 2009, in *People v. Glasper*, 234 Ill. 2d 173 (2009), our supreme court addressed errors in the trial court's failure to comply with the Rule 431(b) questioning based on the permissive language of the rule prior to its amendment in 2007. Ill. S. Ct. R. 431(b) (eff. May 1, 1997). Recently, our supreme court has addressed the amended language of Rule 431(b) (Ill. S. Ct. R. 431 (eff. May 1, 2007)) to address the mandatory language of judicial questioning of the jurors during *voir dire*. *Thompson*, 238 Ill. 2d 598.

In the *Thompson* case, applying the mandatory language of the amended Rule 431(b) (Ill. S. Ct. R. 431 (eff. May 1, 2007)), the defendant asked our supreme court to adopt a "bright-line" rule for reversal of a case for any violation of Rule 431(b). *Thompson*, 238 Ill. 2d at 615, 939 N.E.2d at 415. Our supreme court determined that such a drastic step was not necessary and held:

> "We will not impose automatic reversal for every violation of Rule 431(b) simply to send a message to our trial courts to comply with the amended rule. We are confident that trial courts will continue to take notice of this important rule and employ all necessary steps to ensure full compliance in every criminal case tried before a jury.

17

We further note that trial courts risk reversal of convictions under ordinary appellate review by failing to comply with Rule 431(b). Accordingly, we decline defendant's request for a bright-line rule of reversal for every violation of Rule 431(b)." *Thompson*, 238 Ill. 2d at 616, 939 N.E.2d at 415.

In the instant case, the trial occurred a few months after our supreme court adopted the amended version of Rule 431(b), and the trial court committed error when it failed to question each juror individually regarding the Rule 431(b) questions. Based upon the holding in *Thompson*, this error does not require automatic reversal and we must evaluate whether the court's failure to comply with the amended Rule 431(b) constituted plain error.

## 2. Plain Error

Clearly, defendant forfeited strict compliance with the amended Rule 431(b) by allowing the court to complete *voir dire* without objection and, thereafter, failed to bring the Rule 431(b) error to the court's attention in a posttrial motion. Since neither the State nor defense counsel objected to the procedures employed by the court in this case, the viability of the jury's verdict will be determined by a plain error analysis. "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *Thompson*, 238 Ill. 2d at 613, 939 N.E.2d at 413.

Plain error applies to a forfeited error under two circumstances: " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Thompson*, 238 Ill. 2d at 613, 939 N.E.2d at 413 (quoting People *v. Piatkowski,* 225

18

Ill. 2d 551, 565 (2007)); *People v. Herron,* 215 Ill. 2d 167, 178-79 (2005); *People v. Allen,* 222 Ill. 2d 340, 350 (2006). The doctrine of plain error is not " 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron,* 215 Ill. 2d at 177 (quoting *People v. Precup,* 73 Ill. 2d 7, 16 (1978)). Further, our supreme court has determined that even constitutional errors can be forfeited by a failure to address the errors in the trial court. *Allen,* 222 Ill. 2d at 360.

### a. Plain Error – First Prong

Since we have already determined that the trial court committed error, we begin by examining the first prong considerations of the plain error analysis, which requires us to first decide whether the evidence was closely balanced in the case at bar. Like the evidence in *Glasper*, the evidence in this case was overwhelming. In the instant case, two non-related, independent witnesses placed defendant at the scene of the crime, which involved a violent struggle with the victim. One eyewitness described hearing screams on the night in question and watching defendant, from a window across the street, pulling the victim down an outdoor stairway, then both falling to the ground together, but ultimately out of the eyewitness's sight behind a vehicle. This was the precise location where the victim was later discovered. Several minutes later, this witness observed defendant pick up a knife-like object from near the vehicle and throw it in the woods by the garbage cans.

A second witness testified that she observed defendant walk back and forth past her window, immediately across the street from the scene of the crime, around 7 or 8 p.m. while she was watching television. A third witness, the victim's niece, testified that she called defendant's cell phone at approximately 7:22 p.m. on December 5, 2006, and spoke to both defendant and the victim on the evening the victim's body was discovered. The victim's 12-year-old daughter

19

testified that, at approximately 10 p.m. on that evening, she arrived home and, when she reached the steps of the residence, she found her mother on the ground, and ran back to the car screaming, "Something is wrong with my mom."

When police arrived, they observed the victim's body where the eyewitness last saw defendant struggling with Spires. On December 14, 2006, police officers also recovered a folding box cutter, containing some visible hairs and blood, in a wooded area behind the house. This discovery was consistent with the eyewitness's account describing where she saw defendant walking and then observed him discard something into the woods. Consequently, we conclude the evidence in this case was overwhelming and not closely balanced.

b. Plain Error - Second Prong

Next, we must examine the second prong of the plain error analysis by considering whether defendant has demonstrated the error "was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process," *Herron,* 215 Ill. 2d at 187; *Glasper*, 234 Ill. 2d at 213. Under this second prong of plain-error review, "[p]rejudice to the defendant is presumed because of the importance of the right involved, *regardless* of the strength of the evidence." (Emphasis in original.) *Thompson*, 238 Ill. 2d at 613, 939 N.E.2d at 413 (quoting *Herron,* 215 Ill. 2d at 187, quoting *People v. Blue,* 189 Ill. 2d 99, 138 (2000)). Again, our supreme court has provided instructive guidance by acknowledging that, although the right to an impartial jury is fundamental and constitutionally guaranteed by the sixth amendment, the court's violation of rules in *questioning* the jurors does not necessarily result in a biased jury which automatically requires reversal, nor is it indispensable to a fair trial, but requires balancing the unique circumstances of each case using the principles of harmless and/or plain error. *Thompson*, 238 Ill. 2d at 613-14, 939 N.E.2d at 413.

20

"Rule 431(b) questioning is only one method of helping to ensure the selection of an impartial jury," but it is not the only means of achieving that objective. *Thompson*, 238 Ill. 2d at 614, 939 N.E.2d at 414 (citing *Glasper,* 234 Ill. 2d at 195-96). Even though the amendment to the rule contains mandatory language, our supreme court held that Rule 431(b) questioning is not indispensable to the selection of an impartial jury. *Thompson*, 238 Ill. 2d at 614, 939 N.E.2d at 414.

Under the amended version of Rule 431(b), there are four principles a judge must address during *voir dire* questioning to insure every juror understands and accepts the fundamental principles delineated in the supreme court rule. These principles include: (1) the presumption of innocence; (2) the State's burden of proof beyond a reasonable doubt; (3) the fact that defendant need not present any evidence; and (4) the principle that defendant's failure to testify cannot be considered by the jury. Ill. S. Ct. R. 431 (eff. May 1, 2007). In this case, the judge thoroughly discussed these propositions with the jury during the selection process. Consequently, we have carefully examined the record in this case to determine whether the topics required under Rule 431(b) were addressed by the court or counsel during the course of jury selection.

The record shows the judge specifically covered each of these principles in an introductory explanation to the entire jury panel by stating:

> "The defendant is to be *presumed innocent* of the charge in the indictment, and this presumption remains throughout the trial with the defendant until you've been satisfied by the evidence *beyond a reasonable doubt* as to the guilt of the defendant, and the burden of proving the guilt of the defendant beyond a reasonable doubt is on the State. The law does not require the defendant to prove his innocence. The *defendant is not required to present any evidence or testify*. If

21

he *chooses not to testify* in this case, *it cannot be held against him*." (Emphasis added.)

The judge also informed the entire jury panel that he would give written instructions to them at the close of the case and it would be their absolute duty to accept the law as defined in these instructions and to follow the court's instructions of law. Additionally, during the individual questioning of the jurors, the judge went above and beyond the considerations outlined in Rule 431(b) by asking each potential juror the following questions with minor variations from juror to juror: (1) whether the juror had any bias against a person simply because he has been charged; (2) whether the juror would follow the court's instructions regarding the law; (3) whether the juror would decide the case without sympathy and prejudice; (4) whether the juror would be able to give both the State and the defendant a fair trial; and (5) whether the juror would wait until the end of the entire case before forming a final opinion about the verdict.

In the presence of the entire jury panel, the judge discussed the importance of waiting until the end of the trial to form an opinion with the first impaneled juror subject to the *voir dire* inquiries. The court carefully explained to this juror:

"The reason I ask that is you will find out the State has a burden of proof. They always have the burden of proof. They will put on evidence. The defendant may put on evidence. If the defendant does put on evidence, there could be rebuttal evidence. It could go back and forth a little bit. What I'm asking you to do is to withhold any opinion about the verdict until the case is completely over and you are back deliberating with your fellow jurors, and you indicated you would do that?"

22

Additionally, the prosecution touched upon the burden of proof, which is a topic required for the judge to address by Rule 431(b), when the prosecutor asked some, but not all, of the potential jurors whether they would be able to sign a guilty verdict if they found the State proved its case beyond a reasonable doubt and, likewise, whether they would be able to sign a not guilty verdict if they found the State did not prove its case beyond a reasonable doubt. It seems rational to conclude that, if the goal of the rule is to impanel an informed and impartial jury, any deficiency in the court's inquiries should be subject to repair by the subsequent questioning by the attorneys following the court's initial inquiries. Defendant's attorney did not ask any questions of the jurors relevant to Supreme Court Rule 431(b).

Under the plain-error doctrine, the burden of persuasion rests with the defendant. *Thompson*, 238 Ill. 2d at 613, 939 N.E.2d at 413. Since each one of these Rule 431(b) principles was touched upon by either the judge or the prosecutor during *voir dire*, we conclude that the judge's failure to *strictly* comply with this rule was not so serious that it "affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron,* 215 Ill. 2d at 187. Therefore, we conclude that defendant failed to prove that the court's error resulted in a biased jury or caused his trial to be fundamentally unfair.

After considering the cumulative effect of the circumstances attendant to the selection of the jury in this case, we conclude that the trial court's undeniable error did not rise to the level, under the second prong of the plain error doctrine, causing defendant's trial to be fundamentally unfair and warranting reversal of defendant's conviction. For these reasons, we affirm defendant's conviction.

CONCLUSION

23

The previous judgment entered in this case on October 31, 2007, was vacated. After reconsidering our previous decision in light of *Thompson,* as directed by the supervisory order of our supreme court, we find that the State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt. Further, although the trial court erred by failing to strictly follow the mandates of Rule 431(b), that failure did not render the defendant's trial fundamentally unfair. Accordingly, the judgment of the Peoria County circuit court is affirmed.

Affirmed.

JUSTICE HOLDRIDGE, specially concurring:

I concur in the judgment of the court. I write separately to clarify the proper analysis we must employ to reach our judgment.

In *People v. Thompson*, 238 Ill. 2d 598 (2010), our supreme court established the framework for analyzing violations of Supreme Court Rule 431(b). Ill. S. Ct. R. 431(b) (eff. May 2007). The rule mandates a specific question and response process. "The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule." *Thompson*, 238 Ill. 2d at 607. Regarding the proper methodology for compliance with the rule, "[t]he questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *Id.* The responsibility for compliance with Rule 431(b) rests with the trial court alone and strict compliance with the rule is required. *Id.* However, our supreme court also clearly held that a violation of Rule 431(b) does not fall within the very limited category of "structural errors" which require automatic or "*per se"* reversal of a defendant's conviction. *Thompson*, 238 Ill. 2d at 611.

24

Rather, a violation of Rule 431(b) rises to the level of reversible error only if: (1) the defendant has preserved the error for review, in which case the conviction will be reversed unless the state establishes that the error was harmless beyond a reasonable doubt (*Thompson*, 238 Ill. 2d at 611 (citing *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009))); or (2) the defendant has failed to preserve the error for review, but has established that the "plain-error" doctrine applies. *Thompson*, 238 Ill. 2d at 613. Plain error will permit a court to review an otherwise forfeited allegation of error only if: " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Thompson*, 238 Ill. 2d at 613 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

Given this framework, the analysis in the instant matter is quite simple. The trial court did not strictly comply with the requirements of Rule 431(b), which is a clear and obvious error. Because the defendant failed to raise a timely objection to this error, he has forfeited the issue upon appeal. We will only address his forfeited allegation of error if he establishes either that the evidence against him was so closely balanced as to tip the scales of justice against him, or that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process.

Here, the defendant has failed to establish that the evidence against him was closely balanced. Three different witnesses placed the defendant at the scene shortly before the victim's body was discovered with several deep lacerations to the neck, and at least one

25

witness testified to observing the defendant attack the victim shortly before the body was discovered . Another witness observed the defendant disposing of a knife-like object.

Likewise, the defendant has failed to establish that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. Although an impartial jury is fundamental to a fair trial, strict compliance with Rule 431(b) is not indispensable to the selection of an impartial jury. *Thompson,* 238 Ill. 2d at 614. Where, as here, no evidence is presented to show that the jury was biased, the second prong of the plain-error doctrine will not revive a forfeited claim since we cannot presume that a jury is biased simply because the trial court erred in conducting the Rule 431(b) questioning. *Id.*

Accordingly, I would affirm the judgment of the trial court.